# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY GREGORY JENNINGS,<br><br>   Plaintiff,<br><br> v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>   Defendant. | Case No.: 1:16-cv-00814- JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF ANTHONY GREGORY JENNINGS AND AGAINST DEFENDANT NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

  Anthony Gregory Jennings asserts he is entitled to a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff seeks judicial review of the decision denying his application for benefits, asserting the administrative law judge erred in evaluating the record. Because the ALJ erred in evaluating the lay witness statements, the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

# **BACKGROUND**

  Plaintiff filed applications for benefits on January 25, 2012, in which he alleged disability since his birth on December 5, 1985. (Doc. 10-3 at 12) The Social Security Administration denied the application at the initial level and upon reconsideration. (*Id.*; Doc. 10-5 at 2-5) Plaintiff requested a hearing and testified before an ALJ on August 22, 2014. (Doc. 10-3 at 12) The ALJ determined

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant in this action.

Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on September 17, 2014. (*Id.* at 12-22) Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on April 7, 2016. (*Id.* at 2-4) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.    Background and Medical Opinions**

Plaintiff attended school from kindergarten through second grade in England. (Doc. 10-8 at 2) As third grader, Plaintiff was enrolled in the GATE program at his elementary school in California but had difficulties with reading and was referred for a psycho-educational evaluation by L.V. Francino. (*Id.*) With the Wechsler Intelligence Scale for Children-III ("WISC-III"), Plaintiff had a verbal IQ score of 119, performance IQ score of 126, and full scale IQ of 124. (*Id.* at 4) These test results indicated he was "functioning in the [s]uperior range of intellectual ability with his verbal and nonverbal abilities being equally developed," but he had "[a] learning weakness was noted in the area of short-term auditory memory and attention." (*Id.* at 5) Plaintiff was removed from the GATE class and placed in the Resource Specialist Program. (*Id.* at 14)

As an eighth-grade student, Plaintiff attended a school "for students with learning and attention difficulties," though he was placed with the high school students rather than the junior high class. (Doc. 10-8 at 15) Dr. Patricia Comfort administered the WISC-III in January 2000, and determined Plaintiff's verbal IQ score was 107, his performance IQ was 120, and his full scale IQ score was 114. (*Id.* at 16) According to Dr. Comfort, Plaintiff tested "at the 66th percentile" for freedom from distractibility, which measured his "focus and attention span." (*Id.*) In addition, Dr. Comfort found Plaintiff's processing speed was "at the 32nd percentile," and opined he needed "time to think through

3

information." (*Id.*) She noted Plaintiff "had difficulty remembering details of problems long enough to process them, consistent with Attention Deficit Hyperactivity Disorder." (*Id.*) With the performance test, Plaintiff "scored at the 9th percentile," and Dr. Comfort opined "[h]andwriting tasks [would] be difficult and laborious for him." (*Id.* at 17)

In January 2011, Dr. Jorge Beber, adult and geriatric psychiatrist, noted Plaintiff had been diagnosed as bipolar, with the DSM code of 296.89. (Doc. 10-9 at 10) Dr. Beber observed that Plaintiff's thought content was "not happy, not sad" but "kind of flat." (Doc. 10-9 at 10) Plaintiff reported he was not having any mood swings. (*Id.*) He told Dr. Beber that he did not "do much but prepare[d] his own food" and ate twice a day. (*Id.*) Because Plaintiff felt "funny" with Bupropion, Dr. Beber discontinued this prescription and increased the amount of Lamotrigine. (*Id.*)

In June 2011, Plaintiff told Dr. Beber that he had not been taking any medication other than Alprazolam. (Doc. 10-9 at 8) He said he felt "depressed on [and] off (mild to moderate)." (*Id.*) Plaintiff also said he did not like being alone and went out of his house "maybe once a week." (*Id.*) Dr. Beber observed that Plaintiff appeared restless, fidgety, and anxious. (*Id.*) He noted Plaintiff's thought process was linear and thought content was unremarkable. (*Id.*) Dr. Beber indicated Plaintiff also had a social anxiety disorder, with the DSM code 300.23. (*Id.*)

In September 2011, Plaintiff told Dr. Beber he was feeling "restless, uncomfortable, anxious, [and] somewhat depressed." (Doc. 10-9 at 7) Dr. Beber noted Plaintiff did "not like mood stabilizers [and was] afraid to consider an antipsychotic med." (*Id.*) Dr. Beber observed that Plaintiff appeared anxious and restless. (*Id.*) In addition, he believed Plaintiff's speech was rapid and pressured, and his thoughts were scattered with flight of ideas. (*Id.*)

Plaintiff reported that he was having panic attacks and anticipatory anxiety in December 2011. (Doc. 10-9 at 6) He said there was a period of about two weeks when "he felt depressed [and] was sleeping all day [and was] up all night." (*Id.*) However, Plaintiff told Dr. Beber he was "better for the last month," and he was sleeping ten to twelve hours each night. (*Id.*) Dr. Beber observed that Plaintiff had normal speech, appropriate affect, and a euthymic mood. (*Id.*) He opined Plaintiff's conditions were stable, and indicated Plaintiff should remain on the same medication, with the same doses. (*Id.*)

4

In March 2012, Dr. Beber observed that Plaintiff appeared anxious, and spoke rapidly. (Doc. 10-9 at 5) However, he opined Plaintiff's affect was appropriate, his thought content was linear, and he had good ability to concentrate. (*Id.*) According to Dr. Beber, Plaintiff showed "significant improvement." (*Id.*)

In May 2012, Plaintiff began treatment with Private Case Management Systems. (Doc. 10-9 at 20) Janice Anderson, LCSW, ACSW, BCD, and APA, observed that Plaintiff had "a sad affect [and] depressed mood." (*Id*. at 19-20) She continued to note a sad or flat effect and depressed mood in her treatment notes through September 2012. (*See id.* at 12-19)

In October 2012, Ms. Anderson again noted that Plaintiff "present[ed] a flat affect and a depressed mood." (Doc. 10-9 at 20) In addition, she observed Plaintiff's speech was "low in tone and at times he [was] difficult to understand." (*Id.*) Ms. Anderson reported Plaintiff was "transported to his therapy sessions 1… day per week," and she believed Plaintiff "would be unable to attend his sessions" without help from his parents. (*Id.*)

Dr. Garcia reviewed the medical record in November 2012 and noted Plaintiff had been diagnosed with an affective disorder and an anxiety-related disorder. (Doc. 10-4 at 7) Dr. Garcia opined Plaintiff did not have any restrictions in his activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.*) Dr. Garcia concluded Plaintiff was able to sustain simple, repetitive tasks. (*Id.*) This conclusion was affirmed by Dr. Ikawa on April 26, 2013. (*Id.* at 23)

Dr. R. Graham and J. Guyette, FNP, completed a mental residual functional capacity questionnaire in July 2014. (Doc. 10-12 at 31-33) They noted Plaintiff had been diagnosed with a panic disorder, anxiety, and spina bifida occulta. (*Id.* at 31) According to Dr. Graham and Ms. Guyette, Plaintiff could understand, remember, and carry out very short and simple instructions; but his impairments precluded his ability to understand, remember, and carry out detailed instructions "for 15% or more of an 8-hour day." (*Id.* at 31-32) Dr. Graham and Ms. Guyette opined Plaintiff was precluded from maintaining attention and concentration for extended periods of time, performing activities within a schedule, maintaining regular attendance, working in coordination with or proximity to others without being distracted, completing a normal workday and workweek without interruptions

5

from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and interacting appropriately with the general public. (*Id.* at 32) They also believed Plaintiff had impaired social interaction ability and would not be able to accept instructions and respond appropriately to supervisors, get along with peers or co-workers without distracting them, and maintain socially acceptable behavior for more than 10% of an 8-hour day. (*Id.* at 31, 32) Although Dr. Graham and Ms. Guyette opined Plaintiff did not have reduced intellectual functioning, he did "need assistance [with] reading for comprehension." (*Id.* at 33) They concluded Plaintiff was likely to be absent from work five days or more each month, and that he would be unable to complete an 8-hour work day as a result of his impairments five days or more per month. (*Id.*)

**B.      Administrative Hearing**

    **1.      Plaintiff's Testimony**

Plaintiff testified before the ALJ at a hearing on August 22, 2014. (Doc. 10-3 at 28) He reported that he was twenty-eight years old and lived in a house with his parents, on whom Plaintiff relied for necessities. (*Id.* at 32-33, 34) Plaintiff said he had a twelfth-grade education, and he tried to take a massage therapy course but did not complete it. (*Id.* at 35) He stated he also took "one course of sign language as a college course." (*Id.* at 36)

He reported he last worked part-time at GameStop as a customer service representative. (Doc. 10-3 at 36-37) Plaintiff said his responsibilities included dealing with customers, placing video games and accessories on the walls, and operating the cash register. (*Id.* at 37) He reported that when he applied for the position, he informed GameStop's hiring manager that he "was bipolar, and that [he] was going to be unreliable." (*Id.* at 38) Plaintiff testified the hiring manager said it "would be fine, and he was very flexible and very nice about allowing [Plaintiff] to call in an hour before [a] shift and tell him that [he] wasn't going to make it." (*Id.*) Plaintiff said the manager with whom he worked also understood when he "was changing medications and that [he] wouldn't…show up for work all the time." (*Id.*) Plaintiff stated he was "asked… to leave" when the scheduling system changed and they were not "allowed any sort of change to [the] schedule at all." (*Id.*)

In addition, Plaintiff reported GameStop "did not want [him] around for the holiday section when it becomes very busy," because of his "inability to perform under pressure." (Doc. 10-3 at 43)

He reported he had difficulty helping customers on his own and "would normally get customer complaints" for being rude or "not helping them quickly enough." (*Id.* at 43-44)

Plaintiff believed he was unable to maintain a work schedule due to "anxiety attacks that would show up randomly." (Doc. 10-3 at 38-39) Plaintiff said during a typical anxiety attack, he felt "as though something is going to go wrong, even though [he was] not necessarily in a situation where something could go wrong." (*Id.* at 40) He explained he "could be sitting on the couch, and … just dread that something bad's going to happen," at which point he would take Xanax. (*Id.*) Plaintiff reported the medication helped him feel better "[w]ithin about 15 to 30 minutes," but he was sedated and it impacted his senses to the point he did not "want to drive or have to interact with somebody." (*Id.* at 39, 40-41) Plaintiff explained he did not "want to be under the influence while…driving." (*Id.* at 39)

He estimated he drove "[a]t most twice" each week to visit friends, which was "about 50 minutes of driving." (Doc. 10-3 at 34-35) Plaintiff reported that when visiting his friends, they watched television and played games such as Clue, Monopoly, and Dungeons and Dragons. (*Id.* at 41-42) He said he had difficulty concentrating and "need[ed] to take breaks every now and then" while playing the games. (*Id.* at 42) He believed "inability to focus or form sentences and things of that nature when … trying to talk to somebody" was the primary difficulty caused by his bipolar disorder and anxiety. (*Id.*) Plaintiff estimated he could concentrate on "a simple task [for] 30 minutes or so," and he avoided complicated tasks because he would "get frustrated and have to give up." (*Id.* at 46-47)

He reported that when he was taking bipolar medication, there were "two separate instances where [he] became very depressed and very aggressive because of [an] inability to pain out [the] medication," such as when he was "supposed to take it." (Doc. 10-3 at 49-50) Plaintiff explained he once started arguing with his sister and "pulled a knife on her." (*Id.* at 50) He reported he did not have to be restrained, because his sister "removed herself" from the situation. (*Id.*) Plaintiff said he was seeing a therapist about once a month, though "earlier on" he had been seeing her each week. (*Id.*)

When asked "the last time [he] had an anxiety attack," Plaintiff responded: "Right now." (Doc. 10-3 at 53) The ALJ then asked, "You're experiencing one right now?" (*Id.*) Plaintiff answered, "Situations like this make me very anxious. Yes." (*Id.*)

### 2. **Vocational Expert Testimony**

Cheryl Chandler (the "VE") reported that under the *Dictionary of Occupational Titles*[2], Plaintiff's past part-time work was classified as sales clerk, DOT 290.477-014. (Doc. 10-3 at 55) The VE explained this work was the "lowest level of semiskilled" work, and required a light level of exertion. (*Id.*)

The ALJ asked the VE to consider a hypothetical individual with "the same vocational profile" as Plaintiff. (Doc. 10-3 at 55) The ALJ also stated:

> Within an 8-hour workday, this person can lift and carry up to 50 pounds occasionally, up to 25 pounds frequently. Stand and walk approximately 6 hours and sit approximately 6 hours. This person must also avoid exposure to such hazards as fast moving or dangerous machinery, unprotected heights and traversing uneven or slippery terrain.
>
> This person is further restricted in that they must have the option to alternate between sitting and standing briefly each hour. This person is further restricted in that they can perform simple, routine tasks.

(*Id.*) The VE testified such a person with these limitations could not perform Plaintiff's work as a sales clerk. (*Id.*) However, the VE opined a person could perform "unskilled, light" work, such as a cashier, DOT 211.462-010; counter clerk, DOT 249.366-010; and information clerk, DOT 237.367-018. (*Id.* at 55-56) The VE explained the sit/stand option would erode the base number of jobs available, leaving approximately 12,000 jobs as a cashier; 1,500 jobs as a counter clerk and 5,000 jobs as an information clerk within the state of California. (*Id.* at 55-56)

Next, the ALJ asked the VE to consider an individual who could "lift and carry up to 20 pounds occasionally, up to 10 pounds frequently;" and "frequently climb ladders, ropes and scaffolds." (Doc. 10-3 at 56) In addition, the ALJ stated the person could "have only occasional contact with the public, but may have frequent contact with coworkers and supervisors." (*Id.*) The VE opined an individual with these limitations could not perform Plaintiff's past work, or the positions identified with the first hypothetical. (*Id.* at 56-57) However, the VE opined other work was available, such as marker, DOT 369.687-026; garment sorting, DOT 222.687-014; and garment bagger, DOT 920.687-018. (*Id.* at 57)

---

[2] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

8

The VE explained the number of jobs available for each of these positions would also be eroded for the sit/stand option, but 7,500 marker positions remained available, as well as 10,000 positions as a garment sorter and 22,000 positions as a garment bagger. (*Id.*)

Plaintiff's counsel asked the VE to return the first hypothetical, "but with the added restrictions of this person being absent two to three days a month, and being off task ten percent of the workday." (Doc. 10-3 at 58) The VE opined no work was available for an individual with these additional limitations. (*Id.*)

**C.    Lay Witness Statements**

    **1.    Mary Jennings**

In December 2010, Ms. Jennings, Plaintiff's mother, completed third party function report regarding Plaintiff. (Doc. 10-7 at 3-9) She noted Plaintiff lived with his parents in a house. (*Id.* at 3) Ms. Jennings reported that when Plaintiff was "in the depressive state, which [was] 75% of the time, he [would] not get out of bed or want to talk or even eat." (*Id.*) She explained that it seemed "like a 'switch' [was] turned off," and Plaintiff's ability to complete tasks, concentrate, and remember was impaired. (*Id.* at 8)

According to Ms. Jennings, Plaintiff slept "most of the day" and played video games online at night. (Doc. 10-7 at 4) She asserted Plaintiff stayed in pajamas most of the time, and would "only eat if it was pre cooked." (*Id.* at 4) She noted that "in most cases [Plaintiff] has no desire to do anything." (*Id.* at 6) On a "good" day, Plaintiff would interact with others on the computer for hours. (*Id.* at 7) She believed he went outside "maybe 2 times a week." (*Id.* at 6) In addition, Ms. Jennings reported Plaintiff went shopping only "a few times a year" while "under the supervision of his father." (*Id.*) Ms. Jennings believed Plaintiff was not able to pay bills, handle a savings account, or use a checkbook. (*Id.*) She stated Plaintiff had "always[s] been panicky about paying for anything in a store." (*Id.* at 7) Further, Ms. Jennings explained that when Plaintiff got a job at GameStop, she helped him open a checking account. (*Id.* at 6) However, he overdrew the account and it cost Ms. Jennings "$215.00 to bring the balance to zero and have him close the account." (*Id.*)

She stated Plaintiff relied upon her or his father "to remember [doctor] appointments, and take him there." (Doc. 10-7 at 5) Plaintiff's mother did his laundry "90% of the time." (*Id.*) Ms. Jennings

noted, "When he is not depressed he will clean his bathroom, or bring [her] his clothes to wash." (*Id.*) When in a "manic" state, which occurred "a few times a year," Plaintiff would "clean and cook and do things around the house… for 6-12 hours." (*Id.*)

Ms. Jennings noted Plaintiff also had difficulty with following instructions. (Doc. 10-7 at 8) She explained he could follow written directions well, but he would get "lost" with spoken instructions if too many were given. (*Id.*) Further, Ms. Jennings believed Plaintiff did "not handle stress well at all," as it made him "more depressed." (*Id.* at 9)

### 2. Kristi Mathenia

Ms. Mathenia, Plaintiff's former coworker and supervisor at GameStop, submitted a letter dated August 14, 2014. (Doc. 10-7 at 65) Ms. Mathenia noted: "While working for me, Tony regularly struggled to maintain his schedule and to perform his duties." (*Id.*) She observed that Plaintiff "did rather well" on some days, but "they were unfortunately few and far between." (*Id.*) According to Ms. Mathenia, Plaintiff's "attendance was unreliable" and "[t]here were many days he called out, or had to go home due to severe anxiety attacks." (*Id.*) Further, she observed that Plaintiff "was often overwhelmed and then became unable to function while stressed." (*Id.*) Ms. Mathenia believed that "in spite of several changes in medication, and his best effort, he was not going to be able to perform at a functional level as a GameStop employee," and as a result Plaintiff was let go. (*Id.*)

### D.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity through his date last insured of March 31, 2011. (Doc. 10-3 at 14) Second, the ALJ found Plaintiff's severe impairments included: "bipolar disorder, depressive disorder, anxiety disorder, spina bifida, and lumbar spinal stenosis." (*Id.*) These impairments did not meet or medically equal a listed impairment. (*Id.* at 15-16) Next, the ALJ determined:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404. 1567(b) except the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk six hours and sit six hours in an eight-hour workday, frequently climb ladders, ropes and scaffolds, and must avoid exposures to hazards such as moving mechanical parts or dangerous machinery, and uneven and slippery terrain, and have the option to alternate sitting and standing briefly each hour. The claimant can perform simple routine tasks with frequent contact with coworkers and supervisors and occasional contact with the public.

(*Id.* at 16)  With this residual functional capacity, the ALJ determined "there were jobs that existed in significant numbers in the national economy that the claimant could have performed," including marker, garment sorter, and garment bagger. (*Id.* at 20-21)  Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act through his date last insured.  (*Id.* at 21-22)

## **DISCUSSION AND ANALYSIS**

Plaintiff contends the ALJ erred in evaluating the record, including the lay witness statements of his mother and former employer. (Doc. 17 at 17-29)  Defendant contends this argument "lacks merit, and the Court should affirm the ALJ's decision." (Doc. 19 at 8)

### **A.    Evaluation of Lay Witness Statements**

The ALJ must consider statements of "non-medical sources" including spouses, parents, and others in determining the severity of a claimant's symptoms.  20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work.").  To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness.  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Here, the parties dispute whether the ALJ met her burden to properly address the statements of Mary Jennings and Kristi Mathenia. (*See* Doc. 17 at 17-29; Doc. 19 at 8-10)

Addressing the statement of Ms. Jennings, the ALJ noted: "This report has been considered and given some minimal weight in making this decision.  It appears that the claimant has not been held accountable for his actions and has very little responsibility required in his daily life.  This lack of action does not necessarily show an inability to perform independent tasks." (Doc. 10-3 at 18)  Thus, it appears the ALJ believes Ms. Jennings' statements conflict with the record, yet the ALJ fails to identify any specific conflict.  Rather, the ALJ states only her conclusion that Ms. Jenning's entire report— including statements concerning Plaintiff's "ability to remember, complete tasks, concentrate, and follow instructions" — is worthy of "minimal weight" because Plaintiff has "very little responsibility required." (*Id.*)

Likewise, the ALJ offers odd and incomplete reasoning for rejecting the statement from Ms. Mathenia, who believed Plaintiff's "attendance was unreliable and he was often overwhelmed and

11

unable to function due to stress." (Doc. 10-3 at 19) The ALJ indicated: "The undersigned considers this report in making this decision. It appears that the claimant was given accommodations with his attendance when he worked at Gamestop. However, just because he was given leniency in the past, it does not equate to an inability to perform at a higher level." (*Id.*) Thus, it appears the ALJ determined the statement from Ms. Mathenia conflicted with the ALJ's conclusion that Plaintiff could perform at a higher level. However, the ALJ fails to explain how Ms. Mathenia's observations—that Plaintiff "struggled to maintain his schedule and perform his duties," even with accommodations from GameStop[3]—are inconsistent with the record.[4]

Furthermore, the ALJ did not identify which specific portions of the lay witness statements from Ms. Jennings and Ms. Mathenia that she rejected. For example, it is unclear whether the ALJ rejected the limitations regarding Plaintiff's ability to concentrate, handle stress, maintain a schedule, or maintain attendance. Because the Court cannot speculate as to what evidence from the lay witnesses the ALJ accepted or rejected, the ALJ erred in evaluating the statements of the lay witnesses. *See e.g., Hamilton v. Astrue*, 2009 WL 482330 at *4 (C.D. Cal. Feb. 24, 2009) (finding the ALJ erred where he "did not expressly identify what statements made by the [lay witness] he rejected as not credible, or why those statements were not credible").

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence,
> (2) there are no outstanding issues that must be resolved before a determination of

---

[3] Notably, the ALJ fails to identify to what extent "leniency" was given to Plaintiff compared to other employees, or the accommodations made by GameStop on Plaintiff's behalf. Likewise, the ALJ fails to explain why she believed it was "leniency" rather than an accommodation required by his mental condition.
[4] To the contrary, this statement appears to be supported by the record. Dr. Graham opined Plaintiff was precluded from maintaining attention and concentration for extended periods of time, maintaining regular attendance, and completing a normal workday and workweek without interruptions from psychologically based symptoms. (Doc. 10-12 at 32) Further, Dr. Graham indicated Plaintiff was likely to be absent from work five days or more each month. (*Id.* at 33)

12

disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The ALJ failed to identify legally sufficient reasons for rejecting the lay witness statements offered by Ms. Jennings and Ms. Mathenia. Because the ALJ failed to identify what portions of the statements that she rejected—or *any* evidence in the record that supported her decision to do so— it is appropriate to remand the matter for further proceedings. *See Dodrill*, 12 F.2d at 919 (remanding the matter for the ALJ to "articulate specific findings" for rejecting the testimony of the lay witness); *Moreno v. Colvin*, 2015 WL 1893011 at *9 (C.D. Cal. Apr. 27, 2015) (remanding an action with directions for the ALJ to "reevaluate the lay witness testimony and articulate specific and germane reasons for rejecting any portion of it"). On remand, the ALJ shall make specific findings and specific citation to the evidence, regarding the statements of Ms. Jennings and Ms. Mathenia.

## **CONCLUSION AND ORDER**

The ALJ erred in evaluating the lay witness testimony and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510; *Dodrill*, Because the Court finds a remand is appropriate on these grounds, it offers no findings on the remaining issue in Plaintiff's opening brief.

Based upon the foregoing, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Anthony Jennings and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: __March 15, 2018__    _____/s/ Jennifer L. Thurston__
UNITED STATES MAGISTRATE JUDGE

13